## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                    )

**CRAIG R. JALBERT, in his capacity as**     )
**Trustee of the F2 Liquidating Trust, on behalf**   )
**of himself and all others similarly situated,**    )
                                    )

            **Plaintiff,**             )       **Civil Action No.**
                                    )       **17-12103-FDS**

           **v.**                   )
                                    )

**SECURITIES AND EXCHANGE**      )
**COMMISSION,**                           )
                                    )

           **Defendant.**           )
_____ )

## MEMORANDUM AND ORDER ON
## DEFENDANT'S MOTION TO DISMISS

**SAYLOR, J.**

This is a suit by a bankruptcy trustee challenging the authority of the Securities and Exchange Commission to order disgorgement as part of a settlement of an administrative proceeding. The settlement in question occurred in 2014. The trustee filed suit three years later, seeking to invalidate that settlement, on the ground that the disgorgement was unlawful.

F-Squared Investments, Inc., a Massachusetts-based registered investment adviser, was charged in an SEC administrative proceeding with using materially false marketing materials. In December 2014, it entered into a settlement with the SEC. As part of that settlement, it agreed to pay disgorgement of $30 million and a civil money penalty of $5 million. In addition, it expressly agreed to waive "judicial review" of that settlement by "any court."

In 2015, F-Squared filed for bankruptcy, and Craig Jalbert was appointed as trustee of plaintiff F2 Liquidating Trust, the successor-in-interest to F-Squared.

The trustee now challenges that settlement, contending that the disgorgement portion of the order was unlawful in light of the Supreme Court's opinion in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). The SEC has moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim. For the following reasons, the motion to dismiss will be granted.

I.      **Background**

        A.      **Factual Background**

        The facts are set forth as described in the complaint, attached exhibits, and public record.

                1.      **F-Squared's Securities Violations**

        F-Squared Investments, Inc. was a Wellesley-based investment adviser. (Compl. Ex. A ¶ 5). It was founded by Howard Present in 2006. (*Id.* ¶ 6). It launched its first "AlphaSector" index in October 2008. (*Id.* ¶ 5). The "AlphaSector" investment strategy was an exchange-traded fund ("ETF") sector rotation strategy. (*Id.* ¶ 1).[1] F-Squared would apply ETF trend data to determine whether a particular ETF was in or out of the AlphaSector portfolio. (*Id.* ¶ 2).

        Between October 2008 and September 2013, F-Squared marketed the AlphaSector strategy. (*Id.* ¶ 7). F-Squared's marketing materials included inaccurate statements portraying AlphaSector indices as actual performance in the period from April 2001 to September 2008. (*Id.* ¶ 29). Specifically, F-Squared claimed the strategy was "not back[-]tested," when in fact it

_____

[1] An ETF typically owns shares of stock that closely track an underlying index. For example, the popular ETF SPDR tracks the S&P 500, a leading index that is based on the market capitalization of the 500 largest companies trading on the NYSE or NASDAQ. However, unlike mutual funds, ETFs are traded in the same manner as common stock on exchanges and are accordingly more liquid.

        Sector rotation entails moving funds from one industry sector to another in an attempt to outperform the market.

was.  (*Id.* ¶¶ 1, 7 n.3).[2]  In addition, F-Squared incorrectly applied ETF trend data such that the

AlphaSector strategy implemented buy and sell signals one week before the price shifts creating

the signals actually occurred.  (*Id.* ¶¶ 2-3).[3]

By June 30, 2014, approximately $28.5 billion had been invested pursuant to 75

AlphaSector indices.  (*Id.* ¶ 7 n.3).  $13 billion of that amount was in mutual-fund assets sub-

advised by F-Squared.  (*Id.* ¶ 5).[4]  Most of the assets invested pursuant to AlphaSector indices

were invested through registered mutual funds, other funds, or separately managed accounts

managed by advisers or brokers who received information from F-Squared.  (*Id.* ¶ 7).

### 2.    The Settlement with the SEC

At some point, the SEC began investigating whether F-Squared had violated federal

securities laws.  In December 2014, F-Squared and the SEC entered into a settlement in order to

resolve the matter.  The settlement involved an administrative proceeding, not a civil

enforcement action.

The settlement took the form of an "Offer of Settlement of F-Squared Investments, Inc."

that was accepted by the SEC, although presumably the terms were negotiated in advance.  The

settlement agreement indicated that F-Squared "submits this Offer of Settlement . . . in

anticipation of public administrative and cease-and-desist proceedings to be instituted against it

---

[2] "Back-testing" involves applying an investment strategy to past market conditions to show how the strategy could have performed had it been used then.  However, because it does not portray actual performance, the SEC has restricted its use in advertising.

[3] An investment of $100,000 in the S&P 500 on April 1, 2001, would have been worth $128,000 on August 24, 2008, a 28% increase.  Using an accurately timed, but still back-tested, AlphaSector strategy, the investment would have been worth $138,000 on August 24, 2008, a 38% increase.  Using the inaccurately timed and back-tested AlphaSector strategy, which was the one actually advertised, the investment would have been worth $235,000 on August 24, 2008, a 135% increase.  (Compl. Ex. A ¶ 3).

[4] A fund subadvisor is a third party hired by the fund adviser to help manage a portion of the investment portfolio.

by the [SEC]" pursuant to the Investment Advisers Act of 1940 and the Investment Company

Act of 1940.  (Def. Ex. 1 § I).

Among other things, F-Squared admitted to certain facts; acknowledged that its conduct

violated the federal securities laws; and admitted that the SEC had jurisdiction over it and over

the matters at issue.  (*Id.* § VII).  F-Squared also "consent[ed] to the entry of the attached Order

by Commission, in which the Commission" (1) found that F-Squared willfully violated §§ 204,

206, and 207 of the Investment Advisers Act and various rules promulgated under that act, and

aided and abetted a violation of § 34(b) of the Investment Company Act; (2) ordered that F-

Squared cease and desist from committing any future violations; (3) ordered that F-Squared "pay

disgorgement of [$30 million] to the United States Treasury"; (4) ordered that it pay a "civil

money penalty" of  $5 million to the Treasury; and (5) ordered that it comply with certain

undertakings, largely relating to compliance.  (*Id.*).

The "Offer of Settlement" also included the following language:

> By submitting this Offer, Respondent hereby acknowledges its waiver of those
> rights specified in Rules 240(c)(4) and (5) [17 C.F.R. 201.240(c)(4) and (5)] of
> the Commission's Rules of Practice.

(*Id.* § V).  Rule 240(c)(4) provides as follows:

> (4) By submitting an offer of settlement, the person making the offer waives,
> subject to acceptance of the offer:
>
>> (i) All hearings pursuant to the statutory provisions under which the
>> proceeding is to be or has been instituted;
>>
>> (ii) The filing of proposed findings of fact and conclusions of law;
>>
>> (iii) Proceedings before, and an initial decision by, a hearing officer;
>>
>> (iv) All post-hearing procedures; and
>>
>> (v) *Judicial review by any court.*

17 C.F.R. 201.240(c)(4) (emphasis added).

F-Squared then transferred $35 million to the Treasury Department. (Compl. ¶ 59). No portion of that money was paid to the present or former clients of F-Squared. (*Id.*).

### 3. Later Developments

On July 8, 2015, F-Squared filed for bankruptcy. (*Id.* ¶ 60). Craig Jalbert was appointed by the bankruptcy court as trustee of the F2 Liquidating Trust, F-Squared's successor-in-interest. (*Id.* ¶ 11).

On June 5, 2017, the Supreme Court issued its opinion in *Kokesh*, described in greater detail below.

### B. Procedural Background

The trustee filed this complaint on October 26, 2017. He seeks to represent a class of all securities-law violators who have paid disgorgement to the SEC over the past six years. The complaint does not distinguish between disgorgement orders in administrative or judicial proceedings. It asserts two counts, both brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. Count 1 is a claim that the SEC "exceeded its statutory authority by obtaining 'disgorgement'" in enforcement actions. Count 2 is a claim that the SEC failed to comply with the procedural requirements of federal securities laws by failing to obtain an accounting of profits before ordering disgorgement.

The SEC has moved to dismiss the complaint for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## II. Legal Standard

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and

give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.    Analysis

The trustee contends that in light of the Supreme Court's decision in *Kokesh*, which was issued in 2017, the $30 million disgorgement paid to the SEC as part of the 2015 settlement is invalid. The trustee has multiple hurdles to overcome to establish such a claim. First, and as set forth below, the SEC has explicit statutory authority to enter disgorgement orders in administrative proceedings. Thus, the settlement is valid unless the SEC's exercise of its statutory authority to obtain disgorgement was somehow illegal. Second, and as noted above, F-Squared entered into a binding settlement with the SEC in which it expressly waived judicial review. Therefore, the Court may consider the trustee's claims only if that waiver is somehow void or otherwise ineffective. Third, Congress has created a process for judicial review of SEC

6

orders in administrative proceedings, and that process does not involve the federal district courts.

Accordingly, this Court has subject-matter jurisdiction over the trustee's claims only if that

statutory scheme is somehow inapplicable.

### A.      The Supreme Court's Decision in *Kokesh*

Following the stock market crash in 1929, Congress enacted a series of laws to regulate

the securities industry.  Among other things, the Securities Exchange Act of 1934 ("Exchange

Act") created the SEC to enforce federal securities laws.  "Congress granted the [SEC] power to

prescribe 'rules and regulations . . . as necessary or appropriate in the public interest or for the

protection of investors." *Kokesh*, 137 S. Ct. at 1640 (quoting *Blue Chip Stamps v. Manor Drug

Stores*, 421 U.S. 723, 728 (1975)).

"Initially, the only statutory remedy available to the SEC in an enforcement action was an

injunction barring future violations of securities laws." *Id.*  Despite a lack of explicit statutory

authority, beginning in the 1970s, courts began to order disgorgement in SEC civil enforcement

suits as an exercise of their equitable powers to "deprive . . . defendants of their profits in order

to remove any monetary reward for violating securities laws." *Id.* (quoting *SEC v. Texas Gulf

Sulphur Co.*, 312 F. Supp. 77, 92 (S.D.N.Y. 1970)).[5]

In 1990, as part of the Penny Stock Reform Act, Congress authorized the SEC to seek

monetary civil penalties.  *See* 15 U.S.C. §§ 77h-1(g), 77t(d), 78u(d)(3), 78u-2, 80a-9(d), 80a-

41(e), 80b-3(i), and 80b-9(e).  That act also specifically authorized the SEC for the first time to

seek disgorgement in administrative proceedings.  *See* 15 U.S.C. §§ 77h-1(e), 78u-2(e), 78u-3(e),

80a-9(e) & f(5), and 80b-3(j) & k(5)).  Although the wording of the particular statutory

---

[5] Disgorgement has been defined as "[t]he act of giving up something (such as profits illegally obtained) on demand or by legal compulsion."  BLACK'S LAW DICTIONARY (10th ed. 2014).

provisions varied slightly, all provided that the SEC "may enter an order requiring accounting

and disgorgement, including reasonable interest." (For the sake of simplicity, the Court will

refer to the various statutory enactments, which are largely identical, in the singular.) Congress

did not, however, provide statutory authority to the SEC to obtain disgorgement in civil

enforcement proceedings.

In *Kokesh*, the Supreme Court was presented with the following question: whether

disgorgement ordered in a civil enforcement proceeding constituted a "penalty" subject to the

five-year statute of limitations set forth in 28 U.S.C. § 2462.[6] The Court unanimously held that

disgorgement was such a penalty. *Kokesh*, 137 S. Ct. at 1645. It reasoned that disgorged funds

rarely go to victims, are designed to deter future violations, and are not limited to the amount of

harm caused. *Id.* at 1644-45 ("disgorgement thus bears all the hallmarks of a penalty: It is

imposed as a consequence of violating a public law and it is intended to deter, not to

compensate.").

The Court observed in a footnote: "Nothing in this opinion should be interpreted as an

opinion on whether courts possess authority to order disgorgement in SEC enforcement

proceedings or on whether courts have properly applied disgorgement principles in this context."

*Id.* at 1642 n.3.

Since *Kokesh*, various parties have attempted to challenge court-ordered disgorgement as

exceeding the SEC's statutory authority. Some courts have interpreted *Kokesh* narrowly. *See,

e.g.*, *SEC v. Sample*, 2017 WL 5569873, at *2 (N.D. Tex. Nov. 20, 2017) ("*Kokesh* merely held

that disgorgement claims are subject to 28 U.S.C. § 2462's five-year statute of limitations. [It]

---

[6] That statute provides: "Except as otherwise provided . . . an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ."

had no effect on how courts apply disgorgement principles."); *FTC v. J. William Enters., LLC*, 283 F. Supp. 3d 1259, 1262 (M.D. Fla. 2017) ("the Supreme Court's deliberate avoidance of [the question of whether disgorgement is permissible] provides no basis for this Court to disregard decades of precedent"); *SEC v. Jammin Java Corp.*, 2017 WL 4286180, at *3 (C.D. Cal. Sep. 14, 2017) ("As it presently stands, *Kokesh* is best seen as a decision clarifying the statutory scope of § 2462, rather than one redefining the essential attributes of disgorgement."). Other courts have cautioned that *Kokesh* may have abrogated precedents used to justify disgorgement. *See, e.g.*, *United States v. Latorella*, 2017 WL 2785413, at *4 n.4 (D. Mass. June 27, 2017) (Woodlock, J.) ("It bears noting that the Supreme Court [in *Kokesh*] expressly reserved the question whether courts possess authority to order disgorgement in SEC enforcement proceedings."); *SEC v. Amerindo Inv. Advisors, Inc.*, 2017 WL 3017504, at *8 (S.D.N.Y. July 14, 2017); *Saad v. SEC*, 873 F.3d 297, 305 (D.C. Cir. 2017) ("the Supreme Court's decision in *Kokesh* overturned a line of cases from [the D.C. Circuit] that had concluded that disgorgement was remedial and not punitive") (Kavanaugh, J., concurring). None of those cases, however, addressed the issue of disgorgement in an administrative proceeding, which again is specifically authorized by statute.

**B.**      <u>Whether the Statute Permitted the Imposition of Disgorgement</u>

The trustee argues that the SEC's imposition of disgorgement was unlawful because it was a penalty, not a remedial action intended to benefit investor victims, and because the SEC did not conduct an accounting. (*See* Compl. ¶ 31 (alleging that the agency did not "conduct[] an accounting or return[] funds to investor victims.")). Because Congress has separately provided statutory authority for civil money penalties, the trustee reasons that the SEC is "double-dipping despite statutory limitations" and attempting to rewrite "clear statutory terms." (Mem. in Opp. at 13 (citing *Util. Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2446 (2014)). In other words, the

trustee contends that as a matter of statutory construction, the term "disgorgement" does not include disgorgement as a form of penalty, and that therefore such disgorgement is not authorized. The trustee also contends that because no accounting occurred, the $30 million disgorgement amount paid in the settlement had no connection either to the net profits obtained by F-Squared from the scheme or the gross proceeds it received from investors.

As noted, Congress in 1990 expressly gave the SEC the authority to obtain disgorgement in administrative proceedings. Whether Congress intended only to provide authority for "disgorgement-as-remedy," but not "disgorgement-as penalty," is not obvious from the statutory language. The statute simply uses the word "disgorgement"; it does not say, for example, "disgorgement of profits" or "disgorgement of proceeds in order to provide restitution to victims."[7]

The trustee argues that the term "disgorgement" necessarily excludes punitive disgorgement because the provision permitting civil penalties elsewhere in the statute necessarily precludes other monetary penalties. But many statutory schemes provide for multiple, overlapping forms of penalties (such as imprisonment, fines, and forfeitures in criminal cases). Furthermore, as the trustee himself notes, a broad interpretation of "disgorgement" had been accepted by the courts since the 1970s. It is a basic canon of statutory construction that "Congress is understood to legislate against a background of common-law adjudicatory principles." *Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Twenty years elapsed between the time when the SEC first exercised disgorgement authority in *Texas Gulf Sulphur* and when the Penny Stock Reform Act became law. Arguably, Congress was

---

[7] Disgorgement of profits would eliminate any gain by a violator, but presumably would be insufficient to compensate victims for the loss of their investments; that would normally require disgorgement of some or all of the gross proceeds.

aware of that long-standing practice and intended to codify it, at least in administrative

proceedings.

In any event, this Court need not resolve that issue.  Whatever the merits of the trustee's

argument as a matter of statutory interpretation, that argument has clearly been waived.

### C.        Whether the Waiver Is Valid

As noted above, F-Squared, as part of the settlement, clearly and unambiguously waived

the right to judicial review by any court.  The trustee nonetheless disputes the validity of the

waiver on multiple grounds.

First, the trustee contends that the settlement was "narrowly drawn in a manner that does

not reach this case."  (Mem. in Opp. at 17).  In support, the trustee argues that the waiver only

applied to "direct reviews of orders and not to collateral claims under the APA."  (*Id.*).  But the

waiver does not say that; instead, by its terms, it applies to "[j[udicial review by any court."  A

claim under the APA seeks judicial review of an agency action.  There is nothing in the

settlement to suggest that the waiver of judicial review was limited solely to direct review, as

opposed to collateral review under the APA.

Second, the trustee contends that the waiver was "unenforceable because it was based on

a mistake of law."  (*Id.*).  Specifically, he argues that the settlement was the product of a mutual

mistake because the parties were proceeding on the incorrect assumption that the SEC had the

authority to impose punitive disgorgement, and that no one realized the mistake until the

Supreme Court in *Kokesh* ruled to the contrary.

But even if *Kokesh* changed disgorgement law as to civil enforcement proceedings—and

the Supreme Court specifically noted it did not—that opinion says nothing about the application

of disgorgement in administrative proceedings.  Again, there is no question that the statute, then

and now, explicitly permits the SEC to require disgorgement in administrative proceedings. The

trustee does not contend that the statute is unconstitutional. Rather, and in essence, the trustee is

claiming that (1) the SEC misinterpreted the meaning of the term "disgorgement" in the statute;

(2) by interpreting the statute too broadly, it was acting outside the scope of its statutory

authority—that is, acting *ultra vires*; and (3) by doing so, the SEC was acting unconstitutionally,

in violation of principles of separation of powers. According to the trustee, that is an argument

that "may not be waived or bargained away." (*Id.* at 13).

That argument fails, at a minimum, at the last step. Even if the SEC's application of its

disgorgement authority was *ultra vires*, any such error by the agency was clearly waivable. In

*City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013), the Supreme Court rejected a distinction

between agency errors that are jurisdictional and those that are non-jurisdictional. Justice Scalia,

writing for the Court, observed as follows:

> A court's power to decide a case is independent of whether its decision is
> correct . . . .
>
> That is not so for agencies charged with administering congressional statutes.
> Both their power to act and how they are to act is authoritatively prescribed by
> Congress, so that when they act improperly, no less than when they act beyond
> their jurisdiction, what they do is ultra vires. Because the question—whether
> framed as an incorrect application of agency authority or an assertion of authority
> not conferred—is always whether the agency has gone beyond what Congress has
> permitted it to do, there is no principled basis for carving out some arbitrary
> subset of such claims as "jurisdictional."

*Id.*

Since *City of Arlington*, multiple courts of appeals have held that a party may waive an

*ultra vires* challenge to agency action. *See, e.g.*, *PGS Geophysical AS v. Iancu*, 891 F.3d 1354,

1362 (Fed. Cir. 2018) (finding challenge to action of Patent Trial and Appeal Board as *ultra vires*

waivable) (citing *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505, 520 n.27 (11th

Cir. 2006)); *Metro-North Commuter R.R. Co. v. Dep't of Labor*, 886 F.3d 97, 108 (2d Cir. 2018)

(finding waiver of challenge to agency jurisdiction); *1621 Route 22 W. Operating Co., LLC v.*

*NLRB*, 825 F.3d 128, 140-43 (3d Cir. 2016) (same).

It is thus abundantly clear that any claim that the SEC exceeded its jurisdiction is

waivable, and that F-Squared waived its right to assert such a claim. Accordingly, to the extent

that the trustee is claiming that the settlement exceeded the jurisdictional authority of the SEC,

that claim has been waived.

**D.      Whether the Challenge Should Have Been Brought in the Court of Appeals**

Finally, the trustee contends that his challenge may be brought under the APA, and need

not have been brought as a petition for judicial review with the Court of Appeals.

Both the Investment Advisers Act and Investment Company Act provide as follows:

> Any person or party aggrieved by an order issued by the [SEC] may obtain a
> review of such order in the United States court of appeals within any circuit
> wherein such [party] resides . . . or in the United States Court of Appeals for the
> District of Columbia, by filing in such court, within sixty days after the entry of
> such order, a written petition praying that the order of the [SEC] be modified or
> set aside in whole or in part.

15 U.S.C. §§ 80a-42(a) & 80b-13(a). Under those statutes, F-Squared should have filed a

petition for review challenging the disgorgement order with either the First Circuit or the D.C.

Circuit within sixty days after the order was entered. Because F-Squared entered into the

settlement agreement on December 22, 2014, the deadline for filing such a petition expired on

February 20, 2015. It is undisputed that no petition for review was ever filed.[8]

When a statute provides for "a particular procedure and time period" for challenging

---

[8] Of course, F-Squared did not file such a petition because the matter had been settled—and it had
expressly waived its right to judicial review. But as set forth below, meaningful judicial review was available had F-
Squared elected to challenge the disgorgement order. It therefore had a full opportunity, had it chosen not to settle
the case, to litigate the claims presented here.

agency actions, the APA does not provide an alternative mechanism for judicial review. *See N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135-36 (D.C. Cir. 2015). And as a general matter, "[i]t is well settled that . . . a statute [that] vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomm. Research and Action Center v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984).[9] In *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Supreme Court established a framework for determining when a statute forecloses district-court jurisdiction.

The first question is to determine whether such intent is "fairly discernible in the statutory scheme." *Id.* at 207. At least three courts of appeals have already concluded that the exclusive channeling scheme in the federal securities laws clearly reflects such intent. *See Tilton v. SEC*, 824 F.3d 276, 281 (2d Cir. 2016); *Jarkesy v. SEC*, 803 F.3d 9, 15-16 (D.C. Cir. 2016); *Bebo v. SEC*, 799 F.3d 765, 767 (7th Cir. 2015). The trustee does not appear to challenge that conclusion.

The second question is to determine if the litigant's claims are "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin*, 510 U.S. at 212. In answering that question, district courts are to weigh three factors: (1) the availability of meaningful judicial review, (2) whether the claims are "wholly collateral" to the statutory review provisions, and (3) whether the litigant's claims fall within the agency's expertise. *See Tilton*, 824 F.3d at 282-91. Those three factors are "general guideposts" rather than "distinct inputs" in "a strict mathematical formula." *Jarkesy*, 803 F.3d at 17.

---

[9] The trustee bears the burden of establishing that the court has subject-matter jurisdiction. *See Amoche v. Guar. Trust Life Ins. Co.*, 556 F.3d 41, 48 (1st Cir. 2009). "The usual rule in class actions is that that to establish subject[-]matter jurisdiction one looks only to the named plaintiffs and their claims." *Pruell v. Caritas Christi*, 645 F.3d 81, 83 (1st Cir. 2011). Accordingly, the Court will consider only the trustee's claims.

## 1. Meaningful Judicial Review

The availability of meaningful review has been characterized as the "most important" *Thunder Basin* factor. *See Bebo*, 799 F.3d at 774-75. The trustee here relies heavily on *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010), in which the Supreme Court held that a provision of the Exchange Act governing challenges to final SEC orders did not strip district courts of jurisdiction to hear a constitutional challenge to the Public Company Accounting Oversight Board ("PCAOB"). *Id.* at 489. Writing for the Court, Chief Justice Roberts wrote that "[p]rovisions for agency review do not restrict judicial review unless the statutory scheme displays a fairly discernible intent to limit jurisdiction, and the claims at issue are of the type Congress intended to be reviewed within the statutory structure." (citation and internal quotation marks omitted). *Id.* However, in *Free Enterprise Fund*, the plaintiffs were challenging the constitutionality of PCAOB itself. The Court reasoned that meaningful judicial review would not be provided if plaintiffs were first required to "bet the farm" by violating a PCAOB rule to test the board's legitimacy. *Id.* at 490-91. By contrast, there was undoubtedly an avenue for meaningful judicial review here—unlike in *Free Enterprise Fund*, F-Squared was already subject to a final SEC action (the order requiring disgorgement), which could have been appealed to the Court of Appeals.[10]

The trustee similarly relies on *Freytag v. Comm'r*, 501 U.S. 868 (1991), in which the Supreme Court rejected the government's arguments that petitioners had waived their right to challenge the constitutionality of a statute by failing to make a timely objection before a Special

---

[10] The trustee also relies on *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991). In *McNary*, the Court held that requiring aliens to "voluntarily surrender themselves for deportation" to challenge their denial of Special Agricultural Worker status under the Immigration Reform Control Act was "tantamount to a complete denial of judicial review." *Id.* at 496-97. Again, no such concern was present here.

Trial Judge. The trustee here argues that structural constitutional challenges to agency actions are exempt from statutes restricting judicial review. However, he ignores a long line of judicial precedent upholding statutes that provide for exclusive channeling schemes. The Supreme Court recently addressed this issue in *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11-12 (2012), when it upheld a provision in the Civil Service Reform Act limiting judicial review of decisions from the Merit Systems Protection Board to the Federal Circuit. Accordingly, meaningful judicial review was available to F-Squared under the circumstances presented here.

### 2. **"Wholly Collateral"**

Next, the court must consider whether the trustee's claims are "wholly collateral" to the statutory scheme of the securities laws. That question is interrelated with the question of meaningful judicial review. *See Free Enterprise Fund*, 561 U.S. at 489-90 (analyzing both factors simultaneously).

The Supreme Court did not explain in *Thunder Basin* or its progeny how to determine whether a claim is "wholly collateral." However, the *Elgin* court suggested that a claim is not "wholly collateral if it serves as the 'vehicle by which' a party seeks to prevail in an administrative proceeding." *Tilton*, 824 F.3d at 287 (quoting *Elgin*, 567 U.S. at 22). Lower courts have largely concluded that a claim is "not wholly collateral if it has been raised in response to, and so is procedurally intertwined with, an administrative proceeding—regardless of the claim's substantive connection to the initial merits dispute in the proceeding." *Id.* (citing *Jarkesy*, 803 F.3d at 23; *Bebo v. SEC*, 2015 WL 905349, at *2-4 (E.D. Wis. Mar, 3, 2015).[11]

Here, the trustee's argument, at least arguably, is substantively "unrelated to the

---

[11] Earlier, two other lower courts found that a claim was not wholly collateral to an administrative proceeding only if was substantively intertwined with the merits dispute that the proceeding was commenced to resolve. *See Hill v. SEC*, 114 F. Supp. 3d 1297, 1309 (N.D. Ga. 2015) (vacated by *Hill v. SEC*, 825 F.3d 1236 (11th Cir. 2016)); *Duka v. SEC*, 103 F. Supp. 3d 382, 391 (S.D.N.Y. 2015) (abrogated by *Tilton*, 824 F.3d 276).

securities violations underlying the administrative proceeding." *Tilton v. SEC*, 2015 WL

4006165, at *11 (S.D.N.Y. June 30, 2015). Nevertheless, the claims raised in the complaint

were indisputably raised in response to the SEC administrative proceeding. And had F-Squared

timely filed a petition for review with the Court of Appeals, those claims would have been the

"vehicle by which" it sought to prevail. Nothing barred F-Squared from raising those claims

within the exclusive channeling scheme. Accordingly, the trustee's claims are not wholly

collateral to that scheme.

### 3. Agency Expertise

Finally, the court must determine whether the particular claims here fall within the SEC's

expertise. That is a closer question—in *Free Enterprise Fund*, the Supreme Court held that

petitioners' constitutional claims were "outside the [SEC's] competence and expertise." 561

U.S. at 491. However, in *Elgin*, the Supreme Court provided guiding language stating that

agencies could use their expertise to resolve "the many threshold questions that may accompany

a constitutional claim." 567 U.S. at 22.

Here, the trustee is substantively challenging the SEC's interpretation of "disgorgement"

in the securities laws. Agencies routinely address such statutory claims. *See Tilton*, 824 F.3d at

290 ("[W]e think that the SEC might bring its expertise to bear on the appellants' proceeding by

resolving accompanying statutory claims that it routinely considers, and which might fully

dispose of the case.") (citation and quotation marks omitted); *Jarkesy*, 803 F.3d at 29 ("[T]he

[SEC] could offer an interpretation of the securities laws in the course of the proceeding that

might answer or shed light on [appellant's constitutional] challenge."). Therefore, the agency

had sufficient expertise to consider the trustee's claims during the proceedings against F-

Squared. In any event, even assuming that the SEC was "powerless" to consider the trustee's

claims, that alone is insufficient to "bypass the statutory remedial scheme" "because meaningful review of those claims in an Article III Court of Appeals [was] available." *Tilton*, 2015 WL 4006165, at *13.

Again, F-Squared never presented the trustee's arguments to the SEC—instead, it voluntarily entered into a settlement agreement. Those arguments could then have been presented to the Court of Appeals in a petition for review more than three years ago. Allowing the trustee to circumvent the procedure explicitly set forth by Congress to challenge that settlement would undermine the finality and certainty of SEC orders. *See N.Y. Republican State Comm.*, 799 F.3d at 1136.

In short, the trustee's claims were subject to review within the SEC's exclusive statutory structure, and should have been raised with the Court of Appeals. The fact that this claim has been repackaged under the heading of an APA claim does not exempt it from the exclusive channeling regime Congress prescribed. *See e.g.*, *Jarkesy*, 803 F.3d at 29-30 (holding that the exclusive channeling scheme in the Securities Act and Exchange Act provided the sole means for judicial review despite claims of constitutional violations). This Court accordingly does not have subject-matter jurisdiction over the claims raised.

### 4. The Applicability of 15 U.S.C. § 80b-13

Finally, during the motion hearing, counsel for the trustee cited excerpts from 15 U.S.C. § 80b-13 for the proposition that the Court of Appeals does not have exclusive jurisdiction of final SEC orders until a petition for review has been filed with that court.[12] However, counsel is

---

[12] 15 U.S.C. § 80b-13(a) provides as follows:

Any person or party aggrieved by an order issued by the [SEC] may obtain a review of such order in the United States court of appeals . . . by filing in such court, within sixty days after the entry of such order, a written petition praying that the order of the [SEC] be modified or set aside in whole or in part.

cherry-picking statutory terms in order to create an incorrect interpretation of the statute. It is

black-letter law that filing a notice of appeal in a civil proceeding confers sole jurisdiction on the

courts of appeals, divesting district courts of jurisdiction. *See Griggs v. Provident Consumer*

*Discount Co.*, 459 U.S. 56, 58-59 (1982). Section 80b-13 is the parallel provision in the

Investment Advisers Act that divests the SEC of jurisdiction after a petition for review is filed

with the Court of Appeals. The federal securities laws clearly do not grant district courts

jurisdiction to review SEC orders in administrative proceedings except in one narrow

circumstance—to review temporary cease and desist orders—which is not present here. *See e.g.*,

15 U.S.C. § 80b-3(k)(3)(A), (4)(B) (Investment Advisers Act).

## IV.    Conclusion

For the foregoing reasons, defendant's motion to dismiss for failure to state a claim and

lack of subject-matter jurisdiction is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor

F. Dennis Saylor IV

Dated: August 22, 2018                                   United States District Judge

---

A copy of such petition shall be forthwith transmitted by the clerk of the court to any member of
the [SEC], or any officer thereof designated by the [SEC] for that purpose, and thereupon the
[SEC] shall file in the court the record upon which the order complained of was entered, as
provided in section 2112 of title 28. *Upon the filing of such petition* such court shall have
jurisdiction, which upon the filing of the record shall be exclusive, to affirm, modify, or set aside
such order, in whole or in part.

(emphasis added).